IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BECK INDUSTRIES, LLC, et al., | ) | CASE NO.   1:24 CV 669 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| FORD MOTOR COMPANY, | ) | MEMORANDUM OPINION |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant,

Ford Motor Company ("Ford"). (Docket #47.)

I.      **Factual and Procedural Background.**[1]

   A.      **Ford's Ohio Assembly Plant.**

Ford's Ohio Assembly Plant, located in Avon Lake, Ohio ("the Plant"), employs

approximately 1,800 skilled workers, producing over 450 vehicles per day. (Docket #47-1 at p.

8.) Parts for the vehicles are supplied by over 570 different vendors. (Id.) Over 5,400 parts are

delivered to the Plant daily and over 400,000 parts may be used in a typical eight-hour shift. (Id.)

---

[1]       The facts as stated in this Memorandum Opinion and Order are taken from the
Parties' submissions. Those material facts that are controverted and supported by
deposition testimony, affidavit, or other evidence are stated in the light most favorable to
the non-moving Party.

Although not required, vendors that supply parts to the Plant often use third-party "vendor representatives." (Docket #49 at p. 6.)  Vendor representatives work within the Plant on behalf of the vendor to deal with any issues that arise with the parts being used in the vehicle assembly process. (Docket #47-1 at p. 8.)  Vendor representatives are employed by the individual vendors they represent and are not employed by Ford. (Id.)  There are no contracts or agreements between Ford and the vendors regarding the use of vendor representatives or their access to the Plant, nor are there contracts or agreements between Ford and the vendor representatives themselves. (Id.)  A vendor representative must have authorization from Ford to be on-site.

Problems with the parts used in the vehicle assembly process arise frequently. (Docket #47-1 at p. 8.)  If during the assembly process an issue with a part is identified, the inventory of all such parts currently at the Plant must be inspected and sorted to remove all non-conforming parts. (Id.)  The Incoming Quality Group ("the IQ Group") at the Plant is responsible for initiating this process and works to determine whether the issue is with the part itself; is the result of a defect in the vehicle's design; or, was caused by a Ford employee during the vehicle assembly process. (Docket #49 at p. 7.)  Vendor representatives work on behalf of the vendor during this process, sorting and "reworking" defective parts before they reach the assembly line. (Id. at p. 6.)  If it is determined that the part itself is defective and the vendor is responsible, Ford applies a "chargeback" to the vendor for the associated costs. (Docket #47-1 at p. 8.)

Vendor representatives at the Plant have some latitude in performing initial, small-scale sorts for the vendors they represent. (Id. at p. 9.)  However, third-party sorting companies, employed by the vendors and approved by Ford, are used for large-scale sorts and by vendors

-2-

who do not use a vendor representative.  (Docket #49 at p. 6.)

### B.    Beck Industries and Charlie Beedle.

Charlie Beedle was employed by Ford at the Plant for 30 years.  (Docket #49 at p. 6.)
During his tenure at the Plant, Mr. Beedle worked in various roles and knew Plant assembly
procedures well.  At the time of his retirement in February 2022, Mr. Beedle worked in the IQ
Group.  (Id.)

In 2021, prior to his retirement, Mr. Beedle formed Beck Industries, LLC ("Beck"), with
the goal of operating as a vendor representative at the Plant after his retirement.  From March
2022 until the summer of 2023, Beck represented multiple vendors that supplied parts to the
Plant.  (Complaint at Paragraph 7.)  The vendors were previously represented by QCS, a vendor
representative business owned by Ronald Sleasman.  (Docket #49 at p. 7.)  Mr. Sleasman taught
Mr. Beedle the representative business and Beck assumed the representation of QCS's vendors.
(Id.)  Independent contractors who had previously worked for QCS continued to work for Beck
when Beck assumed representation of the vendors.

There were no contracts between Beck/Mr. Beedle and the vendors Beck represented,
and there was nothing discussed by Beck/Mr. Beedle with the vendors regarding billing or
compensation.  (Docket #47-1 at p. 9.)  According to Mr. Beedle, he simply billed the vendors
"exactly the same" as his predecessor Mr. Sleasman had, without taking any steps to formalize
the details or terms of Beck's work for the vendors.[2]  (Id. at p. 10.)  Plaintiffs state that Mr.

---

[2]
    During his deposition, Mr. Sleasman was asked whether he ever spoke to Mr.
Beedle about the value of the business.  Mr. Sleasman responded, "I told Charlie it would
change the way of his life."  (Docket #47-12 at p. 7.)  Mr. Beedle testified that for each
day he spent at the Plant, he was charging multiple vendors, regardless of whether or not

Beedle's "knowledge of Ford's manufacturing process and relationships with Ford employees were important to the vendors who trusted him to be a fair arbiter inside the Plant." (Complaint at Paragraph 15.)

### C. Access to the Plant Revoked.

On July 11, 2023, Ryan Adkins, Manager of the IQ Group at the Plant, revoked Mr. Beedle's access to the Plant. (Docket #47-1 at p. 13.) Ford cites three separate events as precipitating Mr. Adkins' decision to no longer allow Mr. Beedle inside the Plant: (1) a Ford IQ Group Employee, Christina Jackson, reported Mr. Beedle to Mr. Adkins, alleging that Mr. Beedle had yelled at her for elevating a quality issue for one of Beck's vendors; (2) Mr. Beedle entered a restricted fluid-testing lab in the Plant that was designated as off limits and marked with a sign that read for "authorized personnel only;" and, (3) Mr. Beedle agreed to an IQ supervisor's request to sort parts for a vendor that Beck did not represent, despite Mr. Adkins communicating to him "a number of times" prior that Beck was not to serve as a sorting company. (Id. at p. 13; Docket #54 at p. 54.)

Mr. Beedle denies yelling at Ms. Jackson. Mr. Beedle admits to having entered the restricted fluid-testing lab but states that he entered the restricted area to use his cell phone; that he had witnessed non-Ford personnel enter the lab on multiple occasions; and, that he had never

---

there was work done that day specific to any particular vendor. The invoices Beck sent to the vendors reflect an hourly rate, but Mr. Beedle testified that he was actually billing each vendor a flat rate, broken down into hours, for being available at the Plant all day to address any issues that may arise. (Docket #49 at p. 7.) During one two-week period in October 2022, Beck billed one of the vendors $13,200.00, while at the same time billing other vendors for Beck's time. Plaintiffs state that Beck's invoicing policies and procedures mirrored those of Beck's predecessor. (Docket #47-8.)

been instructed not to enter the lab.  Mr. Beedle admits that Mr. Adkins had discussed with him on several occasions the expectations and rules regarding sorting and acknowledged that, ordinarily, he was not permitted to undertake even small sorts for vendors he did not represent. However, Mr. Beedle argues that in this instance, the sort represented an emergency situation permitting his involvement; that he attempted to formalize a vendor relationship with the affected vendor; that the request to assist with the sort came from a Ford IQ supervisor; and, that Ford's policies regarding who was permitted to sort were unclear or inconsistent.  (Docket #49 at pp. 10-12.)[3]

Following his removal from the Plant, Mr. Adkins instructed Ms. Jackson to send an email to the vendors represented by Beck, notifying them that Mr. Beedle's access to the Plant had been revoked. (Docket #47-1 at p. 13.)   The email, dated July 23, 2023, stated as follows:

Dear supplier,

Effect July 11, 2023, Mr. Charlie Beedle, representing Beck Industries, Inc is no longer authorized to enter OHAP (Ford Truck Ohio Assembly Plant) facility located at 650 Miller Rd, Avon Lake , Oh 44012.

Mr. Beedle was informed of this restriction and instructed to turn in his access badge to security on July 11, 2023 - by Mr. Ryan Adkins, Ford Government Regulations, Ohio Assembly Plant.

Any questions regarding this update can be directed to Mr. Ryan Adkins,

---

[3]
       Shortly after his access to the Plant was revoked, Mr. Beedle sent Mr. Adkins an email.  In that email, Mr. Beedle offered explanation for why he agreed to perform the sort despite knowing he was not permitted to do so and stated that he should not have agreed to help with the sort.  Mr. Beedle also stated that he entered the restricted lab to send an email because he had better cell phone reception within the lab.  (Docket #47-10.)

Phone: 440-933-1267

E-mail: radkins9@ford.com

All vendors affected by this update need to employ a new representative for their company at OHAP.  Information regarding representation on the only two Companies approved by Ford is below

3rd party sort companies approved by OHAP

They can work to investigate/understand the complaint better and return samples.

CERTIFIED SORTS
Jered Cruz (@ OHAP)- cell: 440-204-8142 - email: certifiedsorts@gmail.com
Emad Amireh (@ OHAP) - cell: 440-990-4224, fax: 440-571-0925

CER SOLUTIONS
Bob Judd (@ OHAP) - cell: 440-226-0329 - email: bjudd@cergroupna.com
Steve Sapp - cell: 216-218-4813, office: 586-884-6955, fax: 586-884-6977

Thank you
Christina Jackson

(Docket #47-11.  Unedited.)

As mentioned above, the vendors that Mr. Beedle represented had previously been represented by Ronald Sleasman.  (Docket #47-2 at p. 9.)  Mr. Sleasman had trained Mr. Beedle to take over as the vendor representative for his vendors when he retired.  (Id.)  When Mr. Beedle's access to the Plant was removed, Mr. Sleasman returned temporarily to fill the role. (Docket #49 at p. 15; Docket #47-13 at p. 7.)  Mr. Sleasman coordinated with Mr. Beedle during this time to ensure continuity of representation for the affected vendors.  (Docket #49 at p. 15.)

Mr. Beedle states that in the days that followed his removal from the Plant, he was

-6-

contacted by the various vendors he represented, and that they expressed their desire to still retain Beck and Mr. Beedle as their vendor representative.  (Complaint at Paragraph 41.)  Mr. Beedle states that one vendor advised him that it was no longer permitted to do business with Beck.  (Id. at Paragraph 7; Docket #49-2 at p. 175.)

Plaintiffs claim that Mr. Adkins "harbored ill will toward Mr. Beedle based on disagreements between Mr. Beedle and Mr. Adkins that occurred when Mr. Beedle was still employed at Ford;"  continued to harbor ill will toward Mr. Beedle as a vendor representative; and, "did not like Mr. Beedle personally."  (Docket #49 at p. 25.)  In his Affidavit, Mr. Beedle states the following:

> 10.  Ryan Adkins, a member of the Quality Department, which oversaw the Incoming Quality Department, would sometimes fill in for Frank Keeling if Frank was away from OHAP.  On multiple occasions, I clashed with Ryan Adkins over whether to write up a vendor for a parts-related issue. In these disagreements, Ryan Adkins arbitrarily insisted that parts were defective and the vendors should be financially responsible to correct these issues even though my investigation showed the opposite was true.

> 11.  After our first disagreement, Ryan Adkins became dismissive towards me. Ryan Adkins's treatment continued beyond my time as a Ford employee and persisted during my time . . with my vendor representative business. It is my belief that Mr. Adkins did not like me personally, which explains why he kicked me out of OHAP without any valid reason.

(Docket #49-1.)  Mr. Beedle was questioned about his relationship with Mr. Adkins during his deposition, stating as follows:

> A:  So, yes. And here's the issue:  Ryan Adkins would -- there would be a call. And I would go out and I would know that it was not the vendor's responsibility, it wasn't the vendor's part, and Ryan Adkins still wanted me to write it up. And that was the angst between Ryan Adkins and I, because I'm not going to sit there and write up a vendor for a part that we know is not that vendor's responsibility, not their issue. And that was a big part of our angst.

Q:  Okay. How many times did that happen, what you just described?

A:  Maybe two because -- well, because Ryan -- we really didn't -- I didn't interface with Ryan, because Frank was my boss. Okay. Frank was my boss. So Ryan, you know, he would come down to talk to us and everything, but I only dealt with Ryan directly was when Frank wasn't there. So Ryan would fill in, so. You know, that's how I worked with Ryan, you know.

Q:  And the two times that you can recall, do you recall the parts or the vendors?

A:  No.

Q:  Do you recall any of the details about what was at issue during those two times?

A:  No.

Q:  So all you can remember is, that there were two instances where Ryan wanted you to write something up as a QR that you didn't want to write up as a QR?

A:  Yes.

Q:  Would you characterize these two instances as you and Ryan having a difference of opinion as to whether or not it was the vendor's responsibility?

A:  Difference of opinion or the right thing to do?

Q:  Well, you tell me. I mean, let me ask this question then: Was this an instance where you believed that -- well, let me step back.  In these two instances, was this Ryan Adkins disagreeing with your assessment of who the responsibility was for?

A:  I would say, yes, because Ryan wasn't with me when I was out there talking to the team leader and the operator --

Q:  Okay.

A:  So they are the experts pretty much, you know, but they would tell me, Hey, Charlie, no, no, no, this is not vendor related. Okay. All right. But it would be with Ryan, Write it up.

Q:  Okay. And in these two instances, do you recall his reasoning for why he wanted you to write it up, him telling you that?

A:  Because that's what he wanted to do. He didn't give me a reason, no –

(Docket #54-5 at p. 3.)[4]

---

[4]

　　In their Complaint, Plaintiffs also allege that leadership within the Plant was working to divert business to those with whom they had personal relationships; that  "by stifling Beck, Beedle and Smith," local management was trying to "unfairly shift manufacturing costs onto suppliers;" and, that cost savings resulting from shifting costs to

### C.    Plaintiff, Stephanie Smith.

Plaintiff, Stephanie Smith, is Mr. Beedle's wife.  Plaintiffs state that after Ford revoked Mr. Beedle's access to the Plant, Ms. Smith planned to take over Beck's vendor representative business.  (Docket #47-1 at pp. 14-15 and Docket #49 at p. 8.)  At that time, Ms. Smith was working full time as an attorney and, although she had done some legal work for Beck and had at some point worked at the Plant in a managerial capacity, she had never worked as a vendor representative. (Id.)  Ms. Smith had never completed any training to become a vendor representative.  Ms. Smith did not have any written agreements regarding taking over the vendor representative relationships. (Docket #47-1 at p. 15.)

On July 31, 2023, Ms. Smith texted Mr. Adkins, stating that she was "taking over for Ron Sleasman as vendor rep and wanted to meet with" Mr. Adkins.[5]  Mr. Adkins declined to meet with Ms. Smith and responded, "I have made up my mind on this matter.  We are not going to be working with Beck."  Mr. Adkins stated during deposition that he made his decision because "it would potentially be a situation where she was trying to get Charlie back into the fold . . . I had made my decision to end that relationship."  (Docket #47-1 at p. 14.)  Beck/Mr. Beedle/Ms. Smith were not permitted to return to the Plant.

---

the suppliers make "management eligible for additional compensation and/or promotions." (Complaint at Paragraphs 51-53.)  However, Plaintiffs cite no evidence in the Record to support these claims.

[5]    Although Mr. Sleasman was coordinating with Beck to ensure continuity for the affected vendors during this time, Mr. Sleasman disputes that he intended to train Ms. Smith to take over the vendor representative role as is suggested by Plaintiffs.

## II.     The Complaint.

On February 20, 2024, Plaintiffs filed their Complaint against Ford in the Lorain County Court of Common Pleas, Case No. 24CV211577.  Ford filed a Notice of Removal with this Court on April 15, 2024.

In Count I, Plaintiffs allege tortious interference with Beck's business relationships. Plaintiffs assert that Beck maintained a business relationship with the vendors and that Ford intentionally interfered in Beck's business relationships by wrongfully banning Mr. Beedle from the Plant and emailing the vendors regarding the same.  In Count II, Plaintiffs allege tortious interference with Ms. Smith's business relationships.  Plaintiffs assert that Ms. Smith had taken over Beck's business relationships with the vendors beginning on or about July 31, 2023; that Ford had knowledge of Ms. Smith's relationship with the vendors; and, that Ford intentionally interfered with Ms. Smith's business relationship with the vendors by refusing to meet with her and refusing to grant her access to the Plant.  Plaintiffs assert that Ford's conduct was intended to harm Ms. Smith's business relationship with the vendors.

## III.    Motion for Summary Judgment.

Ford filed its Motion for Summary Judgment on June 2, 2025.  (Docket #47.)  Ford argues that its decision to exclude Plaintiffs from the Plant cannot constitute tortious interference because Ford owns OHAP and, as a property owner, possesses a legal right to exclude Plaintiffs; that the email sent by Ford to the affected vendors accurately conveyed truthful information to the vendors regarding Mr. Beedle/Beck's ban from the Plant and did not cause harm; that Ford had no improper motive or intent to harm Plaintiffs' business relationships; that Plaintiffs lacked definite business relationships given their lack of written agreements with any of the vendors;

-10-

and, that there is no evidence of malice to support Plaintiffs' claim for punitive damages.

Plaintiffs filed their Opposition Brief on July 8, 2025. (Docket #49.) Plaintiffs argue that Beck had existing and prospective business relationships with multiple vendors that were known to Ford; that Ford's July 12, 2023 email, instructing vendors that they would "need to employ a new representative for their company at OHAP," "was sent with the purpose of interfering with Beck's business relationships with the vendors;" and, that Ford knew that excluding Ms. Smith from the Plant was certain or substantially certain to interfere with her existing and prospective business relationships. Further, Plaintiffs state that the issue is "not that Ford communicated Beedle's ban to Beck's vendors" but rather "that Ford fraudulently misrepresented that Beck's vendors were required to get a new vendor representative at the Plant, which caused the vendors to terminate their business relationships with Beck." (Docket #49 at p. 13.)

Ford filed its Reply Brief on July 22, 2025. (Docket #54.)

## IV.    Standard of Review.

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution will

affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. Ohio 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. Mich. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. Ky. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as

an automatic grant of summary judgment, where otherwise appropriate. *Id.*

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## V. Discussion.

In order to establish a claim for tortious interference with a business relationship, a plaintiff must show (1) the existence of a business relationship or contract; (2) the defendant's knowledge of the business relationship or contract; (3) the defendant's intentional or improper action taken to prevent a contract formation, procure the contracts breach, or terminate a business relationship; (4) lack of justification or privilege; and, (5) resulting damages. *Edelstein v. Gmoser*, Case No. 21-3292, 22 U.S. App. LEXIS 24390, at *14 (6th Cir. Ohio 2022)(quoting *Becker v. Cardinal Health, Inc.*, 2021 Ohio 3804, 179 N.E.3d 769, 778-79 (10th Dist. Ohio Ct. App. 2021)).

In determining whether a defendant has acted improperly, the court considers the nature

-13-

of the actor's conduct; the actor's motive; the interests of the other with which the actor's conduct interferes; the interests sought to be advanced by the actor; the social interests in protecting the freedom of action of the actor and the contractual interests of the other; the proximity or remoteness of the actor's conduct to the interference; and, the relations between the parties. 4 Restatement of the Law 2d, Torts, Section 767 (1979). "Although all these factors must be weighed against each other and balanced in arriving at a judgment, [t]he nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not." *Id.* at Comment c.

### A.    Exclusion from the Plant.

Ford owns and operates the Plant and has the common law right to exclude anyone it chooses from the premises. *Hasan v. Tower City Avenue, L.L.C.*, Case No. 1:07 CV 1717, 2008 U.S. Dist. LEXIS 132267 (N.D. Ohio June 5, 2008); *Bresnick v. Beulah Park*, 67 Ohio St. 3d 302, 617 N.E.2d 1096, 1097 (Ohio 1993). "The power to exclude is considered one of the most treasured strands in an owner's bundle of property rights." *Bresnick*, 67 Ohio St. 3d 302, 303, 617 N.E.2d 1096, 1097.

Plaintiffs had no right – contractual or otherwise – to access the Plant. Plaintiffs were permitted on the premises only with Ford's permission and at Ford's discretion. There is no evidence that Beck, Mr. Beedle or Ms. Smith had any right to access the Plant absent permission from Ford; that Ford could not preclude their access; or, considering the Restatement factors delineated above, that Ford's conduct or motive were improper.

Furthermore, it is undisputed that Ms. Jackson complained about Mr. Beedle's behavior to Mr. Adkins and that Mr. Adkins believed that Mr. Beedle made Ms. Jackson feel

uncomfortable; that Mr. Beedle entered a clearly marked, restricted area at the Plant; and, that Mr. Beedle agreed to perform the type of sort that he was explicitly told by management not to perform.  Mr. Beedle disputes yelling at Ms. Jackson, and questions the timing of her complaint to Mr. Adkins about him; claims he entered the restricted area because he had seen other vendor representatives do so and because no one had told him not to; and, offers reasons for why he agreed to assist with the type of sort that he admittedly was previously told by management he was not permitted to perform.  However, there is no evidence in the Record that these incidents did not actually motivate Mr. Adkins' decision to remove Mr. Beedle from the Plant and there is no evidence that the decision to remove Mr. Beedle from the Plant was motivated by anything improper or malicious.  Likewise, there is no evidence whatsoever that the decision not to allow Ms. Smith in the Plant was motivated by anything improper or malicious.

Accordingly, Ford is entitled to summary judgment as to Plaintiffs' claims that removing Mr. Beedle from the Plant or banning Beck, Mr. Beedle or Ms. Smith from the plant constituted tortious interference with their existing or prospective vendor relationships.

**B.      July 12, 2023 Email.**

In support of their claims for tortious interference, Plaintiffs argue, "Ford's primary purpose in sending the July 12th Email was to interfere with BECK's relations with its vendors." (Docket #49 at p. 11.)  Plaintiffs rely primarily upon the language set forth in Ms. Jackson's July 12, 2023 email, notifying the affected vendors that Beck and Mr. Beedle were no longer permitted at the Plant and instructing them to find a new vendor representative.  Plaintiffs focus on the sentence, "All vendors affected by this update need to employ a new representative for their company at OHAP," arguing that vendors are not actually required to have a vendor

-15-

representative at the Plant and, therefore, that "the only plausible explanation for these contradictions is that Ford sent the July 12th Email to BECK's vendors for the purpose of interfering with BECK's business relationships."  (Docket #49 at p. 16.)

Tortious interference claims cannot lie for the dissemination of truthful information. *Richardson v. CVS Caremark Corporation*, Case No. 1:18 CV 1308, 2018 U.S. Dist. LEXIS 149472, at *8 (N.D. Ohio Aug. 31, 2018)(citing *Contemporary Vills. Inc. v. Hedge*, Case No. 2:05 CV 170, 2006 U.S. Dist. LEXIS 41045 (S.D. Ohio 2006); *Dryden v. Cincinnati Bell Tel. Co.*, 135 Ohio App.3d 394, 401, 734 N.E.2d 409, 414 (1st Dist. Ohio Ct. App. 1999); Restatement (Second) of Torts § 772)).  Furthermore, "The doctrine of qualified privilege is applicable to tortious interference cases, and acts performed within a business relationship are considered subject to a qualified privilege." *Chandler & Assoc., Inc. v. America's Healthcare Alliance, Inc.* 125 Ohio App.3d 572, 583, 709 N.E.2d 190 (8th Dist. Ct. App. 1997).  To overcome a qualified privilege, a party must show the wrongdoer acted with actual malice, which denotes an unjustified or improper interference with the business relationship. *Id.* "Actual malice in a tortious interference claim is not ill-will, spite or hatred; rather, it denotes an unjustified or improper interference with the business relationship. *Chandler*, 125 Ohio App. 3d 572, 583 (citing *Smith v. Ameriflora1992, Inc.*, 96 Ohio App. 3d 179, 644 N.E.2d 1038) (1994); *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App. 3d 598, 662 N.E.2d 1088 (1995)).

Ford's email served as notice to the vendors, with whom Ford shared a business relationship, of the fact that Beck/Mr. Beedle were no longer permitted in the Plant.  Ms. Jackson's email truthfully notified the vendors that if they were "affected by this update" that they would need to find someone new.  No reasonable interpretation of Ford's email to the

-16-

affected vendors suggests that Ford was making a representation that vendors were required to hire a vendor representative if they did not otherwise want one, as is suggested by Plaintiffs, and there is no evidence in the Record that any of the affected vendors believed that to be the case.

Further, there is no evidence in the record to support Plaintiffs' claim that the email was worded or sent with the intent to maliciously or improperly interfere with Plaintiffs' vendor relationships. Plaintiffs state that Mr. Adkins "harbored ill will toward Mr. Beedle based on disagreements between Mr. Beedle and Mr. Adkins that occurred when Mr. Beedle was still employed at Ford;" that Mr. Adkins continued to harbor ill will toward Mr. Beedle as a vendor representative; and, that "simply put, Mr. Adkins did not like Mr. Beedle personally." Mr. Beedle refers to two isolated instances in which he and Mr. Adkins disagreed with one another regarding a part quality issue. However, this is insufficient to demonstrate that Ford acted with malice when it emailed the vendors truthfully and accurately notifying them that Mr. Beedle was no longer permitted in the Plant.

Plaintiffs also argue that Ford's email was intended to exert economic pressure upon the vendors, stating the email was "a thinly veiled ultimatum: stop working with BECK or stop selling parts to Ford;" that the email was sent outside of the ordinary course of business; and, that "Ford had no legitimate reason for sending the July 12th Email," thereby creating a genuine issue of fact for a jury. However, Plaintiffs cite no evidence whatsoever that would support their claim that Ford sent the email as some form of economic coercion or that the email was an extraordinary or unusual action by Ford taken for the purpose of improper interference. The email was a truthful notification sent to the affected vendors that Beck and Mr. Beedle were no longer permitted within the Plant.

-17-

Accordingly, Ford is entitled to summary judgment as to Plaintiffs' claim that Ford tortiously interfered with its business relationships by sending the July 12, 2023 email.

**VI.    Conclusion.**

For the foregoing reasons, the Motion for Summary Judgment filed by Defendant, Ford Motor Company, is hereby GRANTED.  Ford is entitled to summary judgment as to all of Plaintiffs' claims.

This case is hereby TERMINATED.

IT IS SO ORDERED.

DONALD C. NUGENT
United States District Judge

DATED: September 19, 2025